IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | |
| FRANCISCO J. SANCHEZ-RIOS | : | 1:19-CR-419-JPB-JSA |
| and | : | |
| LUIS EDWARD SANDOVAL- | : | |
| FERNANDEZ, | : | |

## **REPORT AND RECOMMENDATION**

On September 30, 2019, officers stopped Defendants' car based on suspicions of drug trafficking and other unrelated alleged traffic violations. After a positive alert from a drug detection canine, the officers searched the car and found suspected methamphetamine and other materials. The Defendants now both move to suppress the fruits of this warrantless search and Defendant Sandoval-Fernandez also separately moves to suppress his subsequent statements and the fruits of a consensual search. *See* Motions [25][28]. After a lengthy evidentiary hearing and post-hearing briefing, the Court **RECOMMENDS** that the Motions be **DENIED**.

## I.    FACTS

On September 29, 2019, U.S. Drug Enforcement Administration ("DEA") agents in Kentucky arrested an individual in possession of a kilogram of methamphetamine that she stated she obtained from a house at 4469 Burks Road in

Forest Park, Georgia earlier that day. *See* Transcript, Evidentiary Hearing, April 30, 2021 [65] ("Tr.") at 14. The individual agreed to act as confidential source ("CS") for the DEA, with the understanding that the agents would make the individual's cooperation ultimately known to any relevant prosecutors. *Id*. at 5-6. The CS provided details as to the house at which she claimed to have received the drugs, including the address, a description of the house and the individual she dealt with, and a car present at the location (a red pickup truck). *Id*. at 13.

The agents asked the CS to set up an additional drug transaction from the same Forest Park, Georgia source of supply. *Id*. at 7. The following morning, September 30, the CS made two monitored calls with the alleged supplier. *Id*. at 7-15. The calls were in Spanish but the contents were verified by a Spanish-speaking DEA agent who was listening in. *Id.* at 8-10. In the first call, at approximately 9:34 am, the CS and the alleged supplier discussed a time of "eleven, eleven thirty" for a transaction and the CS requested "three instead of two," that is, three kilograms instead of just two. (Gov't Ex. 1). The alleged supplier said, "I would need to go home to get it because I just brought the two." *Id*. In a second call at approximately 10:00 am, the CS confirmed that she would "need all three," and the alleged supplier stated, "okay, I will go get it then." (Gov't Ex. 2).

Meanwhile officers with Atlanta's High Intensity Drug Trafficking Area ("HIDTA") program were surveilling the 4469 Burks Road location. Tr. at 32. The

officers confirmed that a red pickup truck was present. *Id*. at 166. The officers watched the house to see, among other things, if someone left to travel to a "home" or some other location consistent with the alleged supplier's statement that he needed to pick up an additional kilogram of methamphetamine at a "home." *Id*. at 166-167. At approximately 10:12 am, DEA surveillance officers saw a white pickup truck arrive at the Burks Road location and pick a man up. *Id*. at 33-38. The DEA followed the white truck to a nearby package store. *Id*. The individual entered the store and returned to the same truck, which then drove back to the Burks Road location, and dropped the individual back at approximately 10:26 am. *Id*. The officers did not see the individual carrying anything back to the truck as he left the store and so concluded that this was not the contemplated trip by which the alleged dealer was going to go "home" to pick up the additional kilogram of methamphetamine for the 11:30 transaction with the CS. *Id*.

A few minutes later, at approximately 10:33 am, the surveillance agents saw the same individual leave the house again, this time in a silver Toyota Tacoma pickup truck that had just arrived. *Id*. at 36-38. The agents followed the truck to a residential address on Kevin Lane in Jonesboro, Georgia, where the truck parked at approximately 10:54 am. The officers briefly lost visual contact with the truck and was not able to see whether anyone left or entered the passenger side of the truck.

The truck left the Kevin Lane residence just a few minutes later, at approximately 11:00 am. *Id*. at 57-59.

At this point, the DEA team, which had been in continuous contact with each other, asked the Georgia State Patrol ("GSP") officers that were helping to support the operation to pull over the Tacoma. *Id*. at 170. The GSP was also in contact with DEA throughout the operation and the officers understood that the Tacoma was suspected to be involved in a methamphetamine trafficking transaction. GSP Officer Bradford was in direct contact with the DEA surveillance agents and relayed the information to officer GSP Officers including Officer Ramsey, who ultimately was the one who stopped the Tacoma. *Id*. at 83-85, 170.

Officer Ramsey testified that he learned from Officer Bradford that the Tacoma was likely involved in a methamphetamine trafficking operation. *Id*. at 70, 82-83, 170. Officer Ramsey also claimed that he independently saw that the truck's window tint appeared to be too dark. *Id*. at 86. He testified that he also recalled hearing that the truck had been weaving, although he (Ramsey) apparently did not personally see weaving and the Government did not elicit testimony from any other officer who recalled seeing and reporting weaving. *Id*. at 86.

Officer Ramsey activated his lights to pull over the truck as it came off the highway, and the truck then pulled into the parking lot of a liquor store. *Id*. at 86. Ramsey instructed the driver, Defendant Sandoval-Fernandez, to exit the vehicle.

*Id*. at 88-89. Ramsey asked the Defendant where he was going, to which the Defendant stated that he was going to cash a check at the liquor store. *Id*. Ramsey testified that he found this response to be "odd." *Id*. At approximately three minutes into the stop, Ramsey checked the truck's window tint, which registered at only letting 23% of light through, which was below the legal limit, which requires window tint to allow no less than 32% of light through (plus or minus 3 percent). *Id*. Although Ramsey had testified that he observed the window tint violation while driving, the recording of the traffic stop appears to show Ramsey telling the Defendant that he (Ramsey) noticed the potentially dark tint while the Defendant was pulling into the liquor store lot (i.e., after Ramsey turned on his lights to stop the car). (*See* Dash Cam footage, Gov't Ex. 2, at approx. 3:10).

At approximately 4 minutes into the stop, Ramsey, who had already told Defendant that he (Ramsey) would not write a ticket for the window tint violation, began writing up a warning and order to get the window tint fixed. Tr. [65] at 88-89. During this exchange, Defendant Sandoval-Fernandez told Ramsey that he (Sandoval-Fernandez) had been coming from a "buffet." *Id*. at 90. Ramsey knew this to be a false statement since he understood that the car had just come from a house. *Id*. at 85, 90. The Defendant also stated that the car belonged to the passenger (Co-Defendant Sanchez-Rios) but that this individual did not have a driver's license. *Id*. 90-91. That the purported owner of the car had no legal means

to drive it struck Ramsey as suspicious. *Id*. Generally, Defendant Sandoval-Fernandez struck Ramsey as "really nervous," he had trouble answering simple questions, and he appeared to have difficulty remembering the name of the passenger. *Id*. at 91-92.

In the 8-9 minute range during the stop, Officer Ramsey called in Defendant Sandoval-Fernandez's driver's license information to run a license check. *Id*. at 92-93. Meanwhile, Officer Bradford also arrived on the scene, and proceeded to get the passenger's (Defendant Sanchez-Rios's) identity information. *Id*. at 70-71.

The officers during this time also began coordinating with and giving directions to a K-9 drug detection officer, Trooper Howerton, who arrived with his dog approximately 25 minutes into the traffic stop. *See* Dash Cam Footage, Gov't Ex. 2. After Howerton arrived, he commanded his dog ("Mathis") to conduct an external "open air" sniff search of the Tacoma. *Id*. at 129-130. While walking around the perimeter of the car, Mathis at some point gave what Howerton described as a "final indication" to the odor of narcotics. *Id*. In Mathis's case, his "final indication" was "passive," specifically, he would sit, stare, begin to drool, and sometimes, oddly (and one might say, less passively) get an erection, to supposedly signify an alert to the odor of narcotics. *Id*. at 130. According to Howerton, he and Mattis had been deployed approximately 50 times without ever giving a false alert. *Id*. at 128.

However, Defendants adduced evidence showing that Howerton and Mathis were not fully certified as required by Georgia Department of Public Safety Procedure. Defendant Sanchez-Rios introduced Georgia Department of Public Safety Policy Number 25.07, entitled "Canine Teams," which clearly states that all of the Department's canine teams must maintain an annual certification by at least one nationally or internationally recognized agency. *See* [70-1] at 5. Howerton stated that he was "not aware of" any such certifications that he had, and he appeared during cross-examination to be unaware of the requirement. *See* Tr. at 132. In response to questioning by defense counsel, Howerton simply said, "well, from what you read [i.e., the published policy of the Department at which Howerton worked] it sounds like the K-9 unit requires it but not the individual handler." *Id.* The written policy, however, clearly applies to each individual "canine team," apparently referring to the individual handler and dog, which is clearly different from the overall "Canine Unit," which is separately referred to in the policy. [70-1] at 1. Moreover, defense counsel also showed that the Department of Public Safety did not maintain and could not produce any Canine Deployment Reports regarding Howerton and Mathis, which are the records that would document the results of any deployment in the field. *See Id*. at [70-1] at 14; Def. Ex. 3; Tr. [65] at 133-134. By the time of the hearing, Howerton had retired and was no longer employed by the State Patrol. But Department policy states that the

Canine Deployment Reports are to be maintained in a "permanent" diary, not just until the specific canine handler retires. *See Id.* at [70-1].

After Mathis alerted in this case, Ramsey and Howerton searched the truck. Tr. [65] at 96-97. Inside of a bag, they found a substance they suspected to be methamphetamine. *Id.* at 95-98. The troopers arrested both Defendants and, as Bradford was handcuffing Defendant Sandoval-Fernandez, but before any *Miranda* warnings were issued, he (the Defendant) said words to the effect, "I can't go out like that, man, I can't go out like that. It would have made no big of a difference." *Id.* at 80-81.

Shortly thereafter, DEA officers arrived at the scene and formally administered *Miranda* warnings. *Id.* at 150. Defendant Sandoval-Fernandez waived his *Miranda* rights, made incriminating statements and provided consent to search his residence. *Id.* at 150-157. This search resulted in the discovery of two kilograms of methamphetamine inside a separate pickup truck parked at the residence. *Id.*

## II.     DISCUSSION

### A. *The Vehicle Search*

Defendants both move to suppress the warrantless search of the Toyota Tacoma in which they were traveling on September 30, 2019. The Government argues that the collective knowledge of the officers and agents provided them

sufficient probable cause to believe that the Tacoma was carrying narcotics, thus

justifying a search under the automobile exception to the search warrant

requirement. The Government argues that the officers possessed probable cause

based just on the information provided by the informant, the monitored calls made

by the informant, and the resulting surveillance of the Tacoma as it left the Burks

Road location and traveled to the Kevin Lane residence. The Government argues

that the movements of the Tacoma were consistent with the statements of the

apparent drug dealer at Burks Road saying that he needed to "go home to get [the

additional methamphetamine]" prior to the anticipated drug deal with the

informant.

The Government secondarily argues that all this information at least

supported reasonable suspicion of a crime, thus justifying (in combination with the

supposed window tint or other traffic violations observed by GSP) the traffic stop,

and investigative detention. The Government further argues that to the extent

probable cause did not already exist, the subsequent positive alert by the drug

detection dog in combination with all the other facts clearly satisfied that standard.

Defendants argue that the facts did not show probable cause, and that the

drug dog search was not proven to be reliable. Defendants also argue that the GSP

did not have valid pretextual bases to stop the Tacoma, and unreasonably extended

the time period of the traffic stop which, at most, should have ended shortly after

Ramsey issued his warning on the window tint issue and thereby completed the entire supposed purpose of the stop.

1. *Legal Standards*

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures. U.S. CONST. AMEND. IV. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home [or other private property] without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (*citing United States v. Impson*, 482 F.2d 197 (5th Cir. 1973)). Thus, the government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment. *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951).

Under the automobile exception, a warrantless search of a car is constitutional if the car is "readily mobile" and probable cause exists to believe that it contains contraband or evidence of a crime. *United States v. Lanzon*, 639

F.3d 1293, 1299–1300 (11th Cir. 2011); *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). Probable cause exists to conduct a warrantless search when "there is a fair probability that contraband or evidence of a crime will be found in the vehicle" under the totality of the circumstances. *United States v. Tamari*, 454 F.3d 1259, 1261–62 (11th Cir. 2006) (quotations omitted). Probable cause requires more than a mere suspicion but does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." *United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003) (*quoting Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).[1]

Probable cause is not required to justify a mere investigative stop, however; reasonable suspicion is sufficient for that purpose. *United States v. Powell*, 222 F.3d 913, 917-918 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-475 (11th Cir. 1996). Specifically, to briefly stop a vehicle, an officer must have reasonable and articulable suspicion that the occupants are engaged in criminal

---

[1] Defendants do not contest the mobility element and clearly the facts are sufficient to establish that easily-met standard. After all, the Tacoma had just been driving on the interstate and pulled into the liquor store parking lot under its own power. Even if there were some mechanical issue—which no evidence suggests—the vehicle clearly meets the standard for being readily mobile. *See, e.g., United States v. Vega-Cervantes*, No. 1:14-CR-234-WSD-JFK, 2015 WL 4877657, *10-*11 (N.D.Ga. August 13, 2015) (vehicle needing to be jump-started and which was on a lift for repairs was, nevertheless, "readily mobile" for purposes of application of the automobile exception).

activity, including traffic violations. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Sharpe*, 470 U. S. 675 (1985). To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" *Illinois v. Wardlow*, 528 U.S. 119, 123-124 (2000) (*quoting Terry*, 392 U.S. at 27).

A traffic stop based on reasonable suspicion can escalate into a finding of probable cause justifying a search under the automobile exception, based on facts obtained during the stop. For example, probable cause can arise based on a positive alert by a dog specially trained to detect the odor of narcotics. *United States v. Dunkley*, 911 F.2d 522 (11th Cir. 1990); *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006). The courts have made clear that the use of a drug detection dog to sniff the open air in a public place (such as that around a vehicle sitting in the parking lot of a store open to the public) is not itself considered to be a search for Fourth Amendment purposes. *See United States v. Place*, 462 U.S. 696, 707 (1983) (use of a "canine sniff" by a trained narcotics dog is not a search within the meaning of the Fourth Amendment because it is much less intrusive than a typical search); *Hearn v. Bd. Pub. Educ.*, 191 F.3d 1329, 1332 (11th Cir. 1999) ("A dog sniff of a person' s property located in a public place is not a search within the meaning of the Fourth Amendment.").

The Court, however, is not required to blindly accept the conclusory assertions as to the results of a canine search. While there is no specific litmus test by which to consider the probative value of a canine "open air sniff", the Court must generally consider the dog's training and other evidence of the reliability of the alert in the totality of the circumstances. *See Florida v. Harris*, 133 S.Ct. 1050, 568 U.S. 237 (2013).

Whether a detention or search is based on requisite levels of knowledge can in appropriate cases be viewed in light of the "collective knowledge" doctrine. This doctrine allows a court to impute the knowledge of one or more other officers to the one who specifically engages in the search or other conduct at issue. *See, e.g., United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) ("Probable cause . . . exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed."). The collective knowledge of officers may be considered "if they maintained at least a minimal level of communication during their investigation." *Willis*, 759 F.2d at 1494.

## 2. *The Application Of The Automobile Exception*

Defendants do not specifically challenge the application of the collective knowledge doctrine here. The Court independently finds that the use of the

doctrine is appropriate. The DEA team was in communication with each other during the entire operation, and in specific radio communication with Trooper Bradford during the specific events of September 30th. The agents informed Trooper Bradford as to the facts of the investigation.  Bradford, in turn, directed Trooper Ramsey via radio or telephone communication to pull over the Tacoma. Ramsey testified that he was thereby aware that the Tacoma was believed to have been in the middle of a drug transaction based on the DEA surveillance and investigation and had just come from a residence. These Troopers were clearly a part of the coordinated operation, and these discussions constitute the sort of "minimal level of communication" necessary to justify application of the collective knowledge doctrine. *Willis*, 759 F.2d at 1494.

Based on the collective knowledge of all of the agents participating in this coordinated operation, the Court finds that they possessed probable cause independent of Mathis's alert. In other words, after the Tacoma left the Kevin Lane residence, based on all the facts known at that time, there was at least a "fair probability" that the Tacoma was carrying methamphetamine in preparation for an anticipated drug transaction with the CS. *United States v. Tamari*, 454 F.3d 1259, 1261–62 (11th Cir. 2006).

The facts contributing to probable cause began with the specific information provided by the CS in DEA custody in Kentucky as to having been supplied

methamphetamine at the Burks Road location. The agents had a reasonable basis to conclude that the information from this CS was reliable. First, the CS provided specific and verifiable details including the address, description, and that a red pickup truck was located there. Second, the CS's claims about the drug transactions were further corroborated by the two monitored telephone calls she placed with her supplier, which were consistent with a contemplated drug deal. Third, to the extent the CS agreed to share information at all, she had a strong incentive to provide information that would end up being helpful and seen by the agents as having been truthful. Any rational person in the CS's position would know that falsely leading the agents on a wild goose chase surveilling and searching premises ultimately found to be uninvolved in drug activity would likely not result in favorable treatment in her case.

Thus, the agents had a reliable basis to believe that the individual currently at the Burks Road location as of the morning of September 30th had a supply of methamphetamine to provide to the CS. As for the Toyota Tacoma that Trooper Ramsey ultimately stopped, the combination of the CS's monitored calls with the supplier and the officers' contemporaneous surveillance at the Burks Road location provided probable cause that this vehicle was carrying additional methamphetamine. Specifically, after the CS said that she needed an additional kilogram of methamphetamine beyond what had apparently previously been

discussed ("three instead of two"), the supplier stated that he would need to "go home" to get the additional amount. Approximately 25 minutes after this call, and just approximately one hour before the supposed drug transaction was to occur with the CS, the surveillance team saw someone leave the Burks Road location and go to a "home" on Kevin Lane, for just a few minutes (long enough to pick something up), and drive away again, presumably to return to Burks Road in time to meet the CS for the drug deal.

While this same individual had previously left Burks Road a few minutes before the Kevin Lane trip, that initial trip was to a package store, not a "home," and the surveilling officers saw that the individual was not carrying anything out of the store. Thus, it was reasonable for the officers to conclude that the package store trip was likely not the one described by the supplier on the telephone call, as going "home" to retrieve an additional quantity of drugs. It was reasonable, in the totality of the circumstances, for the officers to conclude that the trip to Kevin Lane was likely to have constituted this trip. Considering all of these facts, the officers would have reasonably concluded that there was a fair probability that the silver Tacoma stopped by Trooper Ramsey contained at least a kilogram of methamphetamine.

As noted above, the Defendants do not contest that the Court may consider the collective knowledge of the various Troopers and DEA agents and officers involved in this operation. Defendants, however, argue that the collectively-known

facts were insufficient to show probable cause. Defendants argue, for example, that the monitored calls did not specifically suggest that a drug transaction would occur at Burks Road, or even state that the supplier was located at Burks Road. Other than verifying the presence of a red pickup truck, according to Defendants, the surveillance of Burks Road did not specifically corroborate that the individual in communication with the CS was located there. Defendants point out that the Government could have taken other steps to corroborate these facts, such as to obtain cell phone tracking information, but did not. Defendants also rely on the instructions by the DEA officers to the Troopers to develop their own independent probable cause to pull over the Tacoma, as well as the agents' use of a drug-sniffing dog, to show that the agents did not themselves believe at the time that they already possessed sufficient probable cause.

Defendants' arguments are unavailing. Again, probable cause did not require clear or definitive proof, or that the officers took every possible step to gather all facts. The standard simply requires, based on the specific facts that the officers had at the time, that there was a fair probability that drugs were in the vehicle. The facts met this standard. It was certainly possible, for example, that the supplier was not located at Burks Road despite what the CS stated. But, as discussed above, the agents had reason to conclude that the CS's information in this respect was reliable, as she had an incentive to be found to be helpful, the statements were

partially corroborated by surveillance, and the movements of the person at Burks Road were very consistent with what the supplier told the CS he would do, both in terms of the timing and destination (a "home").

Defendant Sandoval-Fernandez, in particular relies heavily on the fact that the DEA officers controlling the operation instructed the Troopers to develop their own probable cause. But this instruction does not mean that the team lacked probable cause. The officers may have rationally wished to be extra careful and applied a belt-and-suspenders approach by ensuring an independent basis for the search. Or perhaps the officers wanted to be able to potentially avoid immediately revealing all of these facts including the CS's tips. In the end, this speculation is irrelevant, because the existence of probable cause is a legal conclusion for the Court to assess based on the totality of the circumstances, and the officers' own contemporaneous legal analysis as the events were unfolding is not determinative.

Defendant Sanchez-Rios analogizes to *United States v. Perkins*, 348 F.3d 965, 971 (11th Cir. 2003), which found that "[T]he fact that [the officer's] hunch ultimately turned out to be correct – i.e. that [the suspect was] illegally transporting [drugs] is irrelevant for purposes of the Fourth Amendment. To hold otherwise would open the door to patently illegal searches by government officials, who would attempt to justify the legality of their conduct after-the-fact." *Id*. (internal citations and quotations omitted); Sanchez-Rios Br. [70] at 10. But the facts

collectively known by the officers here were far greater than in *Perkins*. In that case, an officer pulled over a car based on traffic violations and suspected drunk driving, not as part of a deeper operation and ongoing undercover and surveillance operation. The officer simply had a "hunch," based primarily on the driver's nervousness, that something further was afoot. The Eleventh Circuit found that this mere hunch did not justify prolonging the traffic stop to allow for the arrival of a drug sniffing dog. By contrast, the officers here collectively had far more specific reason to believe that there was at least a fair probability that the Tacoma was transporting methamphetamine.

Indeed, the facts of this case are more analogous to (and if anything, are stronger than) those in the seminal Supreme Court case defining the probable cause standard, *Illinois v. Gates*, 462 U.S. 213 (1983). In that case, the police had only an *anonymous* tip that two specific individuals were about to make a trip for purposes of transporting drugs. The police were able to corroborate some limited details corroborating that these individuals were in fact engaged in a trip similar to the one described by the anonymous tipster, but otherwise lacked any other information independently suggesting that the trip was for illegal purposes. The Supreme Court stated that even this limited information provided by an anonymous source was sufficient to establish probable cause justifying issuance of a warrant. In this case, the officers if anything had a more reliable source of information, that is, a specific

CS in police custody who would only presumably expect any benefit if her information proved to be helpful, along with recorded telephone calls suggestive of drug trafficking. And like in *Gates*, the officers also had surveillance that corroborated travel details consistent with the expected drug deal.

For all of these reasons, the Court finds that the facts collectively known by the law enforcement officers were sufficient to support probable cause that the Tacoma was carrying methamphetamine. Thus, the stop and search were justified under the automobile exception.[2]

3.  *The Dog Alert*

The foregoing probable cause analysis is primarily based on the facts known by the officers prior to pulling the Tacoma over. A reliable, positive alert by a trained drug detection dog in addition to all of the facts discussed above would clearly constitute probable cause and make the Court's analysis substantially simpler. The Government argues that the Court should credit canine Mathis's alert in this case and find that it constitutes that sort of clear independent evidence of probable cause.

---

[2] Even if the facts known to the agents prior to the stop were short of the probable cause line, they at least would have given rise to reasonable suspicion of the presence of drugs. Thus, at a minimum, an investigatory traffic stop was permissible. And the lies and other suspicious statements that the driver told Trooper Ramsey at the inception of the stop, including that they were coming from a "buffet," would have been independently pushed the circumstances over the line into the realm of probable cause even if was not already there (which it was).

The Court, however, was not impressed with the testimony of Trooper Howerton or the related evidence of Mathis's "final indication." The Court agrees with Defendant Sanchez-Rios that the canine team consisting of Trooper Howerton and Mathis did not even have the necessary certifications for serving as a drug detection team. Indeed, Howerton did not seem to even be aware of these requirements, further calling into question his qualifications.

Also, while Howerton claimed that Mathis had never had a false positive alert in the field or in training, records are supposed to exist to document and corroborate such claims, but apparently were lost here. The Government suggests that this record-keeping failure likely was a result of Howerton's retirement from the Department. But the Department's policy clearly states that the records are to be maintained in a "permanent diary," not only until a particular Trooper leaves the force. The Court does not necessarily assume any intentional spoliation. But the Government has the burden to prove the reasonableness of a warrantless search. Particularly in combination with Howerton's apparent missing qualifications, the Court has trouble finding that the Government has met its burden based solely on Howerton's assurances uncorroborated by these missing records.

Finally, the footage of the dog's encounter with the Tacoma does not impress the Court as suggesting that this was a reliable procedure on the facts of this case. As Defendants point out, after the alert, Howerton appears to praise the

dog effusively and display gestures suggesting that he (Howerton) is about to give the dog a treat. As Howerton admitted on cross-examination, he gave "positive reinforcement" to reward the dog simply for giving an alert. Tr. [65] at 137. One only has to have casual experiences with dogs to be concerned that Mathis may have been incentivized to alert because he knew he would immediately receive this "positive reinforcement." *Id*. The Government, which has the burden of proof to show the reliability of this procedure, did not adduce any further testimony to clear up why the alert should be considered to be reliable on this record."[3]

In the end, it is unnecessary for the Court to make any final rulings or recommendations on the legal issues relating to the dog search. For all the reasons discussed above, the Court finds probable cause to exist independently of this procedure, and Defendants' objections regarding the dog sniff procedure are moot.

4. *Duration Of The Stop*

In stopping a vehicle, an officer's actions "must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (*quoting Terry*, 392 U.S. at 20); *see also United States v. Cantu*, 227 F. App'x 783, 785 (11th Cir.

---

[3] To the extent this procedure was consistent with qualified training and resulted in past accurate results, the Court's concerns about the impact of this "positive reinforcement" might have been addressed. But, again, the question here is complicated by Howerton's *lack* of apparent necessary qualifications and the absence of evidence of this dog's past results.

2007) (per curiam) (unpublished). Thus, the stop must be of limited duration and "the stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." *United States v. Garcia*, 284 F. App'x 791, 794 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted). The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (*quoting United States v. Holloman*, 113 F.3d 192, 196 (11th Cir. 1997) (per curiam)).

Had the traffic stop been a mere *Terry* or investigative detention based solely on alleged traffic violations, a real question would exist as to whether the stop extended beyond a reasonably necessary duration. On the one hand, the Troopers never bothered pursuing any purported violation of "weaving," and Ramsey concluded almost immediately that he would not write a ticket for the window tint violation. Very little time was therefore necessary for investigating and specifically handling those alleged violations. On the other hand, the officers would have been entitled to detain the Defendants for a brief period to at least confirm identities and check the driver's license and registration information. Here, only a relatively short amount of time (approximately 25 minutes) passed before Mathis's arrival and open-air sniff, during which the officers were checking the suspects' information.

Whether 25 minutes was too long in this case may have been a question open to some debate. But the question is moot here because, as discussed above, the reason for the stop was not limited to a window tint (or weaving) violation. The real reason for the stop was that the officers reasonably suspected—and, indeed, had probable cause to believe—that the car was transporting a significant amount of methamphetamine. It was clearly permissible in these circumstances to extend the traffic stop for the modest period of 25 minutes to await arrival of a drug dog and to allow him to perform a sniff, and then to search the car immediately thereafter. While the dog sniff was not ultimately necessary, as the Court finds probable cause to have already existed, the officers would have been reasonable in taking that additional step to confirm probable cause or at least to be extra prudent before initiating their warrantless search. The officers' probable cause therefore moots the Defendants' challenge based on the scope and duration of the search.

B. *Defendant Sandoval-Fernandez's Statements And Consent To Search His Residence*

As noted above, Defendant Sandoval-Fernandez made certain statements when he was initially arrested, but before having been administered warnings as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). *See* Tr. [65] at 80-81 ("I can't go out like that, man, I can't go out like that. It would have made no big of a difference."). He then made additional statements in response to formal DEA interrogation, after having been advised of and having waived his *Miranda* rights,

24

and he also consented to a search of his residence. He moves to suppress all of his statements, and the fruits of the search of his residence, on the ground that this evidence resulted from the alleged illegal detention and vehicle search. Defendant also argues that the statements at arrest were made in violation of *Miranda*.

In *Miranda*, 384 U.S. at 436, the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement. It is well established that Miranda only applies, however, where "a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980); *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous comments by an accused ... are admissible evidence if the comments were not made in response to government questioning"). Officers engage in the "functional equivalent" of express questioning when they use "any words or actions ... (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis* , 446 U.S. at 309 n. 5.

Here, it is not disputed that the Defendant was in custody as of when he made the statements "I can't go out like that, man, I can't go out like that. It would have made no big of a difference." The Government's position, rather, is that the Defendant did not make these statements in response to any interrogation by the

arresting Troopers. The Court agrees. Defendant does not allege that the officers asked Defendant anything at all to provoke this statement. Nor does Defendant argue that any other specific circumstances, conduct or statements by the officers were the functional equivalent of questioning. To the contrary, all the facts show is that the officers placed handcuffs on Defendant. As noted above, actions "normally attendant to arrest and custody," such as merely handcuffing an arrested subject, do not constitute interrogation. *Innis*, 446 U.S. at 309 n. 5. Defendant's pre-*Miranda* statements are therefore not subject to suppression on this ground.

Defendant argues that all of his statements (pre and post-*Miranda*), and his consent to search his residence, should be suppressed for the additional reason that they were the fruits of the original illegal seizure and search of the vehicle. This argument also fails. As explained at length above, the Court finds no violation vis-à-vis the seizure of the car, the brief detention of the Defendants pending the search, and then the search of the vehicle. Thus, the evidence was not the fruits of any Fourth Amendment violation. Defendant otherwise does not contend that these statements were obtained in violation of *Miranda*, or that he was coerced into involuntarily waiving his *Miranda* rights and consented to the search. Thus, the motion to suppress as to this evidence should be denied.

**CONCLUSION**

Defendants' Motion to Suppress Evidence [25][28] should be **DENIED**.

This matter is **READY FOR TRIAL**.

It is so **RECOMMENDED** this 6th day of October, 2021.

_____
**JUSTIN S. ANAND**
**UNITED STATES MAGISTRATE JUDGE**